NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

KENNETH MIKEAL DUGAN, JR., *Appellant.*

No. 1 CA-CR 15-0190
FILED 3-31-2016

Appeal from the Superior Court in Mohave County
No. S8015CR201400665
The Honorable Steven F. Conn, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Alice Jones
*Counsel for Appellee*

The Brewer Law Office, Show Low
By Benjamin M. Brewer
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Judge Margaret H. Downie delivered the decision of the Court, in which Presiding Judge Andrew W. Gould and Judge John C. Gemmill joined.

_____

**D O W N I E,** Judge:

¶1 Kenneth Mikeal Dugan Jr. appeals his convictions and sentences for possession of dangerous drugs for sale, possession of drug paraphernalia, and misconduct involving weapons. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2 Dugan and eight other persons were indicted after police officers found drugs, money, and weapons while executing a search warrant at residential properties believed to be used for drug trafficking. At the time of the warrant's execution, Dugan was living in a travel trailer parked behind the main residence at one of the properties; his girlfriend, co-defendant Ellen Ruth Dickey, stayed there occasionally. In the trailer, officers found three firearms, a glass pipe, plastic baggies, 6.8 grams of methamphetamine, and a monitor with a live feed from surveillance cameras mounted on the roof.

¶3 The court denied Dugan's motion to suppress, wherein he argued that the search warrant did not specifically mention his trailer or him. The court also denied Dugan's pretrial motion to sever his trial from Dickey's.

¶4 At trial, Dugan admitted that the items seized from the trailer were his, but testified the methamphetamine was for his own personal use. The jury convicted him of the charged offenses, and the court sentenced him to concurrent terms in prison, the longest of which is seven years. Dugan timely appealed.

**DISCUSSION**

**A.      Severance**

¶5 Dugan contends the court erred by denying his pretrial motion to sever, which posited that he and Dickey would blame each other at trial and that he would be prejudiced by evidence of Dickey's prior drug

conviction and history of drug use. The court denied the motion, reasoning that Dugan's defense of mere presence and/or that he did not possess the drugs for sale was not antagonistic to Dickey's announced defense of mere presence, and that a jury instruction would cure any potential "rub-off" effect as to the evidence about Dickey.

**¶6**          We ordinarily review a trial court's refusal to sever for a clear abuse of discretion. *See State v. Murray*, 184 Ariz. 9, 25 (1995). However, Arizona Rule of Criminal Procedure 13.4(c) states that a motion to sever must be made at least 20 days prior to trial and, "if denied, renewed during trial at or before the close of the evidence." "Severance is waived if a proper motion is not timely made and renewed." *State v. Flythe*, 219 Ariz. 117, 119, ¶ 5 (App. 2008). "By limiting appellate review . . . Rule 13.4(c) prevents a defendant from strategically refraining from renewing his motion, allowing a joint trial to proceed, then, if he is dissatisfied with the final outcome, arguing on appeal that severance was necessary." *Id.* at 120, ¶ 9. Because Dugan did not renew his pretrial severance motion during trial, we review only for fundamental error.[1] *See State v. Laird*, 186 Ariz. 203, 206 (1996).

**¶7**          We discern no error — fundamental or otherwise. As relevant here, the court must sever the trial of codefendants only when "necessary to promote a fair determination of the guilt or innocence of any defendant of any offense." Ariz. R. Crim. P. 13.4(a). The court should grant a timely severance request when it detects aspects of the case that might prejudice the moving defendant, such as when "evidence admitted against one defendant has a harmful rub-off effect on the other defendant . . . or . . . co-defendants present antagonistic, mutually exclusive defenses or a defense that is harmful to the co-defendant." *Murray*, 184 Ariz. at 25. To require severance based on antagonistic defenses, the "defenses must be irreconcilable; they must be antagonistic to the point of being mutually exclusive," such that they cannot both be believed. *State v. Cruz,* 137 Ariz. 541, 544–45 (1983).

**¶8**          Dugan's pretrial argument was that the defenses were mutually antagonistic because he would present evidence that the drugs belonged to Dickey, and he believed Dickey would claim the drugs belonged to him. Dickey's counsel, however, informed the court that her defense would "tend to be with mere presence. . . . This was Mr. Dugan's trailer. Ms. Dickey was an overnight guest there. . . . [O]ur defense would be that we're not necessarily trying to blame Mr. Dugan, but simply saying

---

[1]          The portion of the record cited in the opening brief does not support Dugan's assertion that the motion to sever was "renewed prior to trial, but denied again."

what was in there wasn't Ms. Dickey's because she wasn't living there, or had not been there for that long." Under these circumstances, the court did not err in concluding that the defenses were not established to be mutually antagonistic "at this time." Nor did the court abuse its discretion in concluding that any rub-off effect from Dickey's prior conviction could be cured by a jury instruction. Severance on such a basis is rare and is required only if the jury is unable to "keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him." *State v. Grannis*, 183 Ariz. 52, 59 (1995) (quoting *State v. Lawson*, 144 Ariz. 547, 556 (1985)). Here, it was reasonable to believe that jurors would be able to separate the evidence against each defendant.

¶9 Dugan also contends the court should have ordered severance after Dickey's mini-opening statement, where she purportedly blamed Dugan for the contraband found in the trailer, and also after her counsel focused negative attention on him while cross-examining witnesses. We disagree. The actual defenses presented at trial were consistent, not antagonistic. Dugan's defense was that he possessed the drugs for personal use, not sale, and Dickey's defense was that she was merely present at the residence where the drugs were found. Dickey's cross-examination sought to elicit testimony supporting Dugan's defense that he lived on the premises in exchange for repairing vehicles (an activity with which Dickey assisted), and that he possessed the methamphetamine for his own personal use. Dickey's closing argument reiterated her assertion that she was merely present and helping Dugan with his car-repair business. No evidence was presented that Dickey had a prior drug conviction — only that she had been convicted of a felony. Nor has Dugan cited any trial evidence disclosing that Dickey had a history of drug use. Finally, the court instructed the jury that it must consider the charges against each defendant separately.

¶10 On this record, the superior court did not err by failing to sever Dugan's trial from Dickey's trial.

### B. Motion to Suppress

¶11 Dugan contends the court erroneously denied his motion to suppress because the affidavit supporting the warrant failed to identify him as a target of the search or his trailer as one of the structures to be searched. He also argues that officers executing the warrant lacked a reasonable, good-faith belief that the search of his trailer was proper.

¶12 After conducting a hearing, the superior court ruled that the search was proper, and alternatively, that the officers acted in good faith.

In reviewing that ruling, we limit our review to the evidence before the superior court at the time of the suppression hearing, *State v. Blackmore*, 186 Ariz. 630, 631 (1996), and we consider the evidence in the light most favorable to affirming the ruling. *State v. Hyde*, 186 Ariz. 252, 265 (App. 1996). We review the court's ultimate legal determination *de novo*. *State v. Olm*, 223 Ariz. 429, 432, ¶ 7 (App. 2010).

¶13        The search warrant identified the properties to be searched as 991 S. Red Rock Road and an adjacent lot at 1001 S. Red Rock Road, "[t]o include any and all structures, both movable and stationary located within the curtilage of the property." In his affidavit, Detective Frances outlined a two-year investigation involving surveillance, controlled drug buys, interrogation of suspects, and tips from informants, which revealed that Roddy Joe Gomez sold and distributed for sale large quantities of methamphetamine and heroin from the properties in and around 991 and 1001 S. Red Rock Road, and three properties nearby. Law enforcement learned that Gomez lived in a trailer at the front of the property at 991 S. Red Rock Road, and James Pinkerton was living in a trailer on the rear of the property and selling $3,000 to $6,000 in drugs each day from that trailer. Surveillance revealed numerous instances of short-term foot and vehicular traffic at the properties that were indicative of drug sales.

¶14        The warrant was requested after police arrested Kenneth Jones upon finding him passed out in his vehicle, blocking the road. Jones told the officers that Gomez supplied him with a pound of heroin and a pound of methamphetamine every other week (an amount officers subsequently found in Jones's vehicle), and that Gomez was "moving" at least one kilogram (2.2 pounds) of both methamphetamine and heroin each week. Officers also noted that Jones made the following statements:

> Gomez hides his illegal drug supply, money, and weapons in various locations on his property (991 Red Rock Rd). Additionally Gomez uses the property located adjacent to his (1001 Red Rock Rd.) which is also under his control to hide drugs, money and weapons to include the trailer that Gomez's mother lives in near the front of the property. Jones further stated that he had been at both locations [within] the last couple of days.

Detective Frances obtained the search warrant that same day, and the Mohave Area General Narcotics Enforcement Team executed the warrant that afternoon.

¶15            Detective Frances testified that Dugan's name did not come up during the investigation of Gomez's drug-trafficking organization, "[b]ut there were a lot of people there we couldn't identify." Nor did officers know before executing the warrant that Dugan's trailer was parked behind the main residence on the 1001 S. Red Rock lot. Detective Frances estimated, though, that at any given time, between 40 and 50 trailers and vehicles were located on the two properties, and "there were so many movements of vehicles and motor homes and trailers, that we didn't have a specific name or specific trailer associated with who was attached to either one." Moreover, law enforcement had information that whomever was on the property was assisting Gomez in the drug sales and that Gomez would "use the different locations and different vehicles on the property, and his mother's motor home, to hide weapons, drugs and money."

¶16            Search warrants are governed by the Fourth Amendment, which protects the "right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. A magistrate may issue a search warrant only based on a showing of "probable cause, supported by affidavit, naming or describing the person and particularly describing the property to be seized and the place to be searched." Ariz. Rev. Stat. ("A.R.S.") § 13-3913. Although a warrant for a multiple-occupancy structure is generally invalid if it does not describe the subunit to be searched, where the entire premises is under suspicion of illegal activity, a warrant authorizing a search of all structures on the premises may be valid. *See State v. Burns*, 163 Ariz. 44, 46 (App. 1989).

¶17            The warrant at issue here permitted a search of "any and all structures, both movable and stationary located within the curtilage of the property," based on probable cause to believe that Gomez controlled what occurred at the premises, used the entire premises for drug trafficking, and was hiding drugs, money and weapons in vehicles and other structures located on the property. Under these circumstances, the warrant was not overbroad by authorizing a search of the entire premises, including Dugan's trailer. *See United States v. Alexander*, 761 F.2d 1294, 1300–01 (9th Cir. 1985) (warrant authorizing search of entire 40-acre ranch for drugs was not overbroad due to failure to mention small trailer in which defendant was found).

¶18            The superior court did not err in denying the motion to suppress.

6

### C.     Jury Deliberations

**¶19**     Finally, Dugan argues the court violated Arizona Rule of Criminal Procedure 22.1(c) "by ordering the jurors to remain beyond normal work hours without first consulting the jury and parties." We disagree.

**¶20**     The court prescreened the jury for four days of trial, seating 12 jurors and one alternate. Counsel, though, did not complete closing arguments until 4:30 p.m. on the fourth day of trial — a Friday. Before the jury retired to deliberate, the court stated:

> I'm going to give you a couple of options. One of them is to just recognize the hour that it is, and maybe go home and come back next week; but I need to see if that's going to be an issue. The other one is to start deliberating, with the idea that I would not let you deliberate any later than seven o'clock tonight, because that's the hour beyond which we are not going to be here [anymore].

When the court inquired if anyone could not return the following week, two jurors stated that they could not. The court responded:

> Well, that may have made up our minds, then. So, the clerk, at this time, will draw the name of one of – and counsel, if it were just one person that could not be here next week, I would be saying we will designate that person as the alternate. My thought is, we will just pick the alternate in the usual random manner; and what I would normally say about stopping at seven o'clock, that is not going to be the case, because we are going to finish this case. So, hopefully, that's agreeable to everyone.

No objection was raised, and the jury retired to deliberate.

**¶21**     The court later commented, "So, counsel, I don't feel real good about having suggested to the [jurors] that they are going to stay here until they make a decision, but I don't think we had any other options under the circumstances." As an alternative, the court suggested that (1) "if the jury were to reach a verdict on Ms. Dickey's cases, we could actually excuse more alternates, because it is only because of Ms. Dickey that we even have a 12-person jury;" or (2) "[i]f you all want to agree at some point . . . that she would not get over 30 years in prison, maybe we could designate some more of these people as alternates, like the people who can't be here next

week, and the jury would be able to go home." The court responded to a request for clarification from Dickey's counsel as to whether the "seven o'clock rule" had been lifted, stating that the court would not "just arbitrarily tell [the jurors] that they cannot deliberate past seven o'clock." No further record was made on the issue, and the jury reached verdicts on all charges at 7:03 p.m.

**¶22** Because Dugan did not object to the court's handling of the jury deliberation issue, he bears the burden of demonstrating that the court erred, that the error was fundamental, and that he was prejudiced. *See State v. Henderson*, 210 Ariz. 561, 567, ¶¶ 19–20 (2005). He has not carried this burden.

**¶23** Rule 22.1(c) states: "The court shall not require a jury to deliberate after normal work hours unless the judge, after consultation with the jury and the parties, determines that evening or weekend deliberations are necessary in the interest of justice and will not impose an undue hardship upon the jurors." Here, the court consulted with the jury by discussing available options. After learning that two jurors could not return the following week, the court implicitly concluded it was "necessary in the interest of justice" to direct the jury to continue deliberating Friday evening. The court also could have reasonably determined that the deliberations would not impose an undue hardship on jurors when no one spoke up after the remark, "So, hopefully, that's agreeable to everyone." Additionally, the court consulted with the parties by discussing alternative measures that would permit the two jurors who could not deliberate the following week to be excused.

**¶24** Finally, Dugan has not demonstrated the requisite prejudice under fundamental error review. His speculation that the jury might have felt rushed to reach a verdict is insufficient. *See State v. Munninger*, 213 Ariz. 393, 397, ¶ 14 (App. 2006). Nothing in the record suggests that was the case, and after the verdicts were read, the court individually polled the jurors, and each affirmed the verdicts.

## CONCLUSION

¶25      For the foregoing reasons, we affirm Dugan's convictions and sentences.



Ruth A. Willingham · Clerk of the Court
FILED: ama